# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

ROBERT B. MELSON,          )
                          )
         Petitioner    )
                          )
    vs.                  )     4:04-cv-3422-VEH-HGD
                          )
DONAL CAMPBELL, Commissioner,  )
Alabama Department of Corrections,  )
                          )
         Respondent   )

## MEMORANDUM OF OPINION

This is a petition for writ of habeas corpus filed December 13, 2004, on behalf of Robert B. Melson, who was convicted of capital murder in 1996 in Etowah County, Alabama, and sentenced to death.  In his amended petition, Melson presents the following claims for relief:

**A.** Melson's capital murder conviction was based on insufficient evidence in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  *See Jackson v. Virginia*, 443 U.S. 307 (1979). [Doc. #9, at 32-35, ¶¶ 65-70].

**B.** The State failed to comply with discovery obligations.  *See Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.  [Doc. #9, at 35-38, ¶¶ 71-74].

**C.** The trial court denied Melson's Sixth Amendment right to confrontation when it improperly denied a mistrial after the prosecution elicited information that Melson's co-defendant informed police Melson had worn certain shoes at the time of the crime.  *See Bruton v. United States*, 391 U.S. 123 (1968); *Crawford v. Washington*, 541 U.S. 36 (2004). [Doc. #9, at 39-40, ¶¶ 75-77].

**D.** Six separate claims of prosecutorial misconduct.  [Doc. #9, at 40-53, ¶¶ 78-105].

1.   The prosecutor undermined Melson's presumption of innocence and shifted the burden of proof. *Id.* at 41-43, ¶¶ 79-82.

2.  The prosecutor improperly referred to Melson as an animal and made other remarks designed to show Melson's bad character rather than his guilt of the offense. *Id.* at 43-46, ¶¶ 83-89.

3.   At the guilt stage of the trial, the district attorney inappropriately injected the issue of whether Melson felt remorse. *Id.* at 46-47, ¶¶ 90-91.

4.  The prosecution instructed the jurors to return guilty verdicts in order to do their job and keep their oaths to God. *Id.* at 47-48, ¶¶ 92-93.

5.   The prosecutor argued nonstatutory aggravating evidence that was calculated to appeal to the passions and prejudices of the jury. *Id.* at 48-51, ¶¶ 94-100.

6.  The prosecutor told the jury to give Melson the death penalty for breaking God's law and to send a message to the community. *Id.* at 5153, ¶¶ 101-105.

**E.**  Melson's Sixth, Eighth, and Fourteenth Amendment rights were violated when the trial court denied his motion for change of venue. [Doc. #9, at 54-57, ¶¶ 106-112].

**F.**  The trial court improperly denied Melson's pretrial request to discover the criminal history of the state's witnesses, and the prosecutor improperly refused to provide material information to Mr. Melson during discovery.  [Doc. #9, at 57-60, ¶¶ 113-120].

**G.**   The cumulative effect of the above claims entitles Melson to a new trial. [Doc. #9, at 60, ¶ 121].

**H.**   Melson is actually innocent of the crime for which he has been convicted, capital murder, and sentenced to death.   [Doc. #9, at 61-62, ¶¶ 122-125].

2

For relief, Melson requests permission to conduct discovery, an evidentiary hearing, and issuance of a writ of habeas corpus granting him relief from his unconstitutionally obtained conviction and sentence of death. [Doc. #8, #9 & #24].

In his initial reply, respondent moves this court to dismiss the habeas petition as untimely under 28 U.S.C. § 2244(d)(1)(A) (also known as the Anti-Terrorism and Effective Death Penalty Act ("AEDPA")), and refuses to address Melson's claims of actual innocence, arguing that Melson did not assert that he was entitled to equitable tolling with regard to that claim, and in any event, Melson failed to provide any showing of newly discovered evidence of his innocence along with the filing of his amended petition. *Id.*

On July 1, 2005, the magistrate judge ordered Melson to reply to respondent's motion to dismiss, and further directed Melson to revise his discovery requests in scope and description to the issues pertaining to the motion to dismiss. On July 21, 2005, Melson filed an opposition to respondent's motion to dismiss with attached affidavits [Doc. #19], and revised his initial discovery request. [Doc. #24]. Each individual request for discovery pertains to Melson's argument that "the petition is timely because it is based on newly discovered evidence, and because Mr. Melson is actually innocent." [Doc. #24, at 1-8].

On July 27, 2005, respondent filed objections to Melson's revised request for discovery. [Doc. #25]. In it, respondent contends Melson "is not entitled to discovery at this stage of the proceedings because he has not produced any evidence of actual innocence[,] . . . . and the information contained in [Melson's] affidavits is neither 'new' nor 'reliable.'"

3

*Id.* at 3.  Respondent also argues the "AEDPA is manifestly intended to curtail the abuse of the habeas corpus petition and contemplates specific exceptions to its limitations period[.] [T]herefore, further equitable exceptions to its requirements are not appropriate."[1]  Next, respondent declares Melson is not entitled to discovery because an

> actual innocence claim must be based on actual, new reliable evidence in the possession of the petitioner, evidence which may exist or become available if the petitioner prevails on the merits is irrelevant, no matter how compelling or beguiling it promises to be.  It is a petitioner's obligation to first come forward with credible evidence of factual innocence.

*Id.* at 5.

Finally, respondent argues that even if this court were to determine that Melson is entitled to some discovery, the revised requests are not sufficiently narrow.  *Id.* at 7.  Based upon the foregoing, this court must determine whether Melson's petition is timely as provided by the AEDPA statute, and if not, whether equitable tolling principles may be applied.  The court must also determine whether Melson's claims, if timely or subject to equitable tolling, are procedurally defaulted.  The decisions made in the foregoing arenas will govern whether Melson is entitled to discovery, an evidentiary hearing, or relief.

---

[1]  *Id.* at fn. 2.  Respondent correctly contends the United States Supreme Court has "never squarely addressed the question whether equitable tolling is applicable to AEDPA's statute of limitations" because the specific question has never been presented to it.  *Pace v. DeGuglielmo*, — U.S. —, 125 S.Ct. 1807, 1814, fn. 8 (2005), *citing Pliler v. Ford*, 542 U.S. 25, 124 S.Ct. 2441, 159 L.Ed.2d 338  (2004).  *Id.*  Respondent then argues, as set out above, that equitable tolling of the AEDPA statutory provision is not permissible, but only makes this argument as to whether such tolling may be applied to Melson's "actual innocence" claims.  [Doc. #25, at 4, fn 2].  While the Supreme Court has never ruled on the issue, the Eleventh Circuit has allowed equitable tolling of this limitations period "in rare instances," *Diaz v. Department of Corrections*, 362 F.3d 698, 700 (11th Cir. 2004), and has never clearly stated that equitable tolling cannot be applied in the case of actual innocence.  *See Howell v. Crosby*, 415 F.3d 1250 (11th Cir. 2005); *Helton v. Secretary for Dept. of Corrections*, 259 F.3d 1310 (11th Cir. 2001). Thus, equitable tolling of AEDPA's statutory provisions shall be considered in this Memorandum of Opinion.

Discussion of the issues shall be presented in the following order: (1) 28 U.S.C. § 2244(d)(1)(A) and equitable tolling related thereto, (2) 28 U.S.C. § 2244(d)(1)(D), equitable tolling related thereto, and *Schlup v. Delo*, and (3) ineffective assistance of post-conviction counsel when it pertains to questions 1 and 2. Prior to the discussion, however, and because the arguments surrounding plaintiff's claims necessarily involve a review of the evidence presented during trial, the findings of fact made by the Alabama Court of Criminal Appeals are set out below. Pursuant to 28 U.S.C. § 2254(e)(1), these factual findings are presumed to be correct.

## PREAMBLE

The appellant, Robert Bryant Melson, was convicted of three counts of murder made capital because the killings were committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975; one count of murder made capital because it involved the murder of two or more persons by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975; one count of attempted murder, see §§ 13A-6-2 and 13A-4-2, Ala.Code 1975; and one count of robbery in the first degree, see § 13A-8-41, Ala.Code 1975. The jury recommended, by a vote of 10-2, that Melson be sentenced to death for his three convictions for the capital offense of murder during the course of a robbery. The trial court accepted the jury's recommendation and sentenced Melson to death by electrocution. The trial court additionally sentenced Melson to life imprisonment without the possibility of parole for his capital conviction for the murder of two or more persons; to 40 years' imprisonment for his conviction for attempted murder; and to 40 years' imprisonment for his conviction for robbery in the first degree.

The state's evidence showed the following. At approximately 12:00 a.m. on April 16, 1994, four employees of Popeye's restaurant in Gadsden were closing the restaurant. The restaurant had closed to the public at 11:00

5

p.m. One of the employees, 17-year-old Bryant Archer, testified that he was helping his coworker, 17-year-old James Nathaniel Baker, take out the trash. Archer testified that the back door to the restaurant was locked, and that another coworker, 23-year-old Darryl Collier, unlocked the door for them. When they opened the door, a black male and a Hispanic male entered and ordered Archer, Baker, Collier, and 18-year-old Tamika Collins, another employee at the restaurant, into the restaurant's office. The two men ordered the employees, at gunpoint, to remove the money from the restaurant's safe. They complied, and were then ordered by the black male to get inside the restaurant's freezer. Shortly after they were locked inside the freezer, the black male opened the freezer door and began shooting. Baker, Collier, and Collins all suffered close-range gunshot wounds to the head, and were dead when paramedics arrived at the scene. Although Archer suffered four gunshot wounds, he survived and was able to crawl from the freezer to the restaurant's office and telephone 911 for help.

When the police arrived at the restaurant, Archer was able to identify one of the men as Cuhuatemoc Peraita, a former employee at Popeye's. [FN1] Archer told officers from the Gadsden Police Department that the other man was a black male, but that he was unable to identify Melson because both men were wearing bandanas over their faces. Archer was able to identify Peraita by his distinctive hairstyle. Archer further told the police that the black man ordered him and his coworkers into the freezer at gunpoint and locked them inside. According to Archer, the black man then opened the freezer door and began shooting. Archer also told the police that although he did not see the car that the men were driving, he knew that Peraita drove an older model black Chevrolet Monte Carlo.

> FN1. We affirmed Peraita's conviction for capital murder and his sentence of life imprisonment without the possibility of parole by unpublished memorandum issued September 26, 1997. *See Peraita v. State*, 725 So.2d 1075 (Ala.Cr.App.1997)(table).

After the police had gotten Archer's description of the suspects and of the type of car they might be driving, a BOLO ( "be on the lookout") was issued at 12:36 a.m. for a black male and a Hispanic male driving an older model black Monte Carlo. Officer Terry Graham of the Rainbow City Police Department received the BOLO and recognized Archer's description of the

suspects as people that he knew.  Graham then went to Peraita's house, and he saw an older model black Monte Carlo parked in front of the house.  Graham also noticed some activity inside Peraita's house.  When the Monte Carlo left Peraita's house, Graham followed the car and eventually pulled the car over.  Graham testified that Melson was driving the car and Peraita was in the front passenger's seat.  Both Melson and Peraita were taken into custody at 1:20 a.m., just a little over an hour after the robbery and murders.  They were then transported to the Gadsden Police Department for questioning.

During his questioning, Melson maintained that he and Peraita had been together all night on the evening of April 15, 1994, and that they were separated only when they were pulled over by the police and arrested at 1:20 a.m. on April 16, 1994.  Melson told the police that they had been driving around smoking marijuana and that they had driven by Popeye's several times that evening, but they had never gone inside the restaurant.  Melson further told the police that he and Peraita had gotten their clothes wet that evening and that they had gone to Peraita's house to change clothes.

On April 18, 1994, two days after he gave his initial statement to the police, Melson asked to speak again to the investigating officer.  Melson gave a second statement at that time in which he stated that Peraita had picked him up at 4:00 p.m. on April 15, 1994, and that the two of them had driven around in Peraita's car most of the evening, smoking and selling marijuana.  Melson said that at approximately 11:50 p.m., Peraita told him that he was going to visit his girlfriend, who worked at Popeye's.  Melson stated that he then asked Peraita for a ride to "Green Pastures."  Melson further stated that he walked around "Green Pastures" until about 1:00 a.m., when Peraita picked him up again.  Melson said that Peraita asked him to drive, and that he (Melson) saw the police cars and ambulances at Popeye's.  According to Melson, Peraita tried to tell him what he had done, but Melson said that he did not want to know.  Melson said that he and Peraita then went to Peraita's house to change their clothes because it had been raining that night and their clothes had gotten wet.

Laura Laverty testified that Melson had spent the night of April 14, 1994, with her, and that he had spent most of the day of April 15 with her as well.  She testified that Melson left her house with Peraita at approximately 4:30 p.m. on the afternoon of April 15, 1994.  She said that Melson and Peraita returned at approximately 11:00 p.m. that evening, and that they stayed at her house for 30 minutes.  Although Melson told Laverty that he was coming back,

he did not return.  Laverty also testified that Peraita had told her, two weeks before the murder, that he was thinking about robbing Popeye's.  Laverty testified that Peraita had also stolen a gun several weeks before the robbery and murders at Popeye's.

Laverty further testified that she had visited Melson in jail on a regular basis for about a month after his arrest.  Laverty said that Melson had asked her to talk to a girl named Melissa and a guy named "Big Dirt," to see if they would go to Melson's lawyers and tell them that they had seen Melson somewhere else when the robbery and murders were alleged to have occurred.  Laverty testified that when Melson left her house at 11:30 p.m. on April 15, 1994, he was wearing a University of Alabama sweatshirt, blue jeans, tennis shoes, and a hat.

Melissa King testified that she and Melson had dated for several months before the robbery and murders at Popeye's, and that they had broken up in February 1994.  She further testified that Melson had written her three letters from jail since his arrest in April, asking her to go to the police and to his lawyers, and to provide him with an alibi on the night of the robbery at Popeye's.  King refused to do so, and she took the letters to the police.

Evidence presented by the state linking Melson to the murders included testimony concerning items found during a search of Peraita's house.  Inside Peraita's house the police found a bag filled with money; an Alabama sweatshirt; two pairs of blue jeans; one pair of tennis shoes; and one green bandana.  In Peraita's front yard, the police found six shell casings.  These casings were positively identified as having been fired from the murder weapon, which had been recovered after the murders from the Coosa River.

John Case of the Alabama Department of Forensic Sciences testified that he had compared a set of plaster casts made from shoeprints that were found several days after the murders in a ditch behind Popeye's, to the tennis shoes Melson was wearing when he was arrested.  Case testified that in one of those plaster casts, he found imprints of two pebbles and a seed that were imbedded in the tread of the shoe that left the shoeprint.  When comparing that plaster cast to Melson's left tennis shoe, Case concluded that, in his opinion, "to find by chance another shoe that would be the same size, the same brand, and have the same degree of wear or lack of wear and also have those inclusions in the same spot on the same shoe and on the cast would be very remote such as to make it impractical to consider another shoe."  (R. 1637.)

8

*Melson v. State*, 775 So.2d 857, 863-866 (Ala. Crim. App. 1999).

## **DISCUSSION**

Respondent moves this court to dismiss Melson's habeas petition as untimely, because he contends "Melson filed his petition well past the one-year limitation period set forth in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244(d)(1)." [Doc. #13, at 1]. Although there are four possible dates that can be used to calculate the one-year statute of limitations, in his motion to dismiss respondent declares only 28 U.S.C. § 2244(d)(1)(A) is applicable to Melson's case. *Id.* at 2. Under this section, the calculation date is one year from "'the date on which the judgment became final by conclusion of direct review or the expiration of time for seeking such review.'" *Id. quoting* 28 U.S.C. § 2244(d)(1)(A).

In his opposition to the motion to dismiss, Melson contends respondent's argument that his petition is untimely is wrong. [Doc. #19, at 52, fn 11]. He also argues that respondent failed to address two additional reasons he claims the application survives the timeliness requirements of 2244(d). *Id.* First, Melson asserts 28 U.S.C. § 2244(d)(1)(D) allows "[h]abeas corpus relief [to be] sought in excess of one year of a conviction becoming final" if the petition is filed within one year from "'the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of reasonable diligence.'" *Id.*

9

Second, Melson argues the AEDPA statute of limitations is subject to equitable tolling because he is actually innocent of the crime. *Id. quoting Schlup v. Delo,* 513 U.S. 298 at 316. Melson attaches affidavits of ten (10) witnesses in support of his declarations concerning newly discovered evidence and actual innocence.[2]

Melson contends that in the fall of 2004, he discovered evidence of his innocence which "conclusively establishes" that he is innocent of the crime. [Doc. #9, at 11-31, 61-62]. Moreover, some of the evidence could not have been previously discovered because the State suppressed material exculpatory and impeaching information. *Id.* at 35-38. In his opposition to respondent's motion to dismiss, Melson asserts these claims are timely because 28 U.S.C. 2244(d)(1)(D) affords him one year from the date of the discovery of new evidence to file a habeas petition. [Doc. #19, at 26-37].

For edification purposes, 28 U.S.C. § 2244 (d)(1)(A) & (D) and (d)(2) read as follows:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –

---

[2] *Id.* at attachment. The court takes the opportunity at this juncture to find that the affidavits of DeFranco and Watkins in no way present newly discovered factual evidence, as the information in the DeFranco and Watkins affidavits are only proffered to reveal the procedural history of Melson's Rule 32 petitions as same can be applied to the timeliness of the federal petition. Therefore, discussion of same as newly discovered evidence is unnecessary in the context of Melson's *Brady*/*Schlup* claims. Further, Melson's factually unsupported assertion that there exist witnesses who can provide evidence of Melson's innocence, and who are either identified in pleadings and fail to provide affidavits in support of their alleged claims, or who are unidentified and purportedly have declined to present affidavits due to alleged reprisals from the community, are likewise not worthy of further discussion. [Doc. #9, at 19, 23-24.]

10

(A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; . . . . or

(D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(d)(2)  The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

**I.  Was the federal petition filed within the statutory time limitations set out in 28 U.S.C. § 2244(d)(1)(A) of the AEDPA, and if not, is equitable tolling justified?**

The parties agree Melson's case became final on March 5, 2001, the day the United States Supreme Court denied certiorari review on direct appeal.  [Doc. #13, at 2] and [Doc. #19, at 25].   Respondent declares, and Melson does not dispute, that pursuant to 28 U.S.C. § 2244(d)(1)(A), he had one (1) year from March 6, 2001, to file a federal habeas corpus petition.  [Doc. #13, at 2] *quoting* Rule 6, FED.R.CIV.P., and Rule 11, *Rules governing Section 2254 Cases in the District Courts of the United States*.[3]  It is also undisputed that the one year time period can be tolled by "a properly filed application for State post-conviction relief." *Id.* at 3.  Additionally, respondent argues that, pursuant to 28 U.S.C. § 2244(d)(2),

"[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  Thus, whether Melson's habeas petition is timely depends, in

---

[3]  These rules govern the particular days that are to be counted toward any statutory or court ordered deadline.

part, on whether he **properly filed** an application for State post-conviction relief on or before March 6, 2002. "[A]n application is '*properly* filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings." *Artuz v. Bennett*, 531 U.S. 4 at 8, 121 S.Ct at 264 (2000). Therefore, under *Artuz*, state procedural rules govern whether an application for State post-conviction relief is "properly filed."

*Id.*

The parties disagree, however, as to whether Melson's first Rule 32 petition was "properly filed" according to the Alabama Rules of Criminal Procedure. [Doc. #13, at 3] and [Doc #19, at 27, fn 11]. Before making a determination regarding either party's position, the Court will review the history and content of the document in dispute.

Melson filed his first Rule 32 petition in the Circuit Court of Etowah County, Alabama, on March 4, 2002, and it was assigned case number "CC 1994-925.60-C." [V.21, R-45, at 1-15]. However, the initial petition was not sworn to under oath or penalty of perjury by petitioner or counsel in accordance with Rule 32.6(a) of the Alabama Rules of Criminal Procedure. [Doc. #13 at 4]. Rule 32.6(a) A.R.Crim.P. reads *in pare materia*:

> **Form, Filing and Service of Petition**. A proceeding under this rule is commenced by filing a petition, verified by the petitioner or petitioner's attorney, with the clerk of court. A petition may be filed at any time after entry of judgment and sentence . . . The petition should be filed by using or following the form accompanying this rule. If that form is not used or followed, the court shall return the petition to the petitioner to be amended to comply with the form.

The accompanying form shows that a properly verified petition is a petition sworn to under oath or penalty of perjury by the petitioner or counsel of record (to his/her best knowledge, information and belief). *Appendix* to Rule 32. In response to Melson's initial

12

petition, the State moved to dismiss for Melson's failure to comply with Rule 32.6(a).  [V.21, R-46, at 1-2].  In its request for relief, the State moved the trial court

> to require Melson's counsel to file an addendum to the Rule 32 petition within twenty-one days providing verification of the claims contained within the petition as set out in the appendix to Rule 32 A.R.Cr.P.  Because Melson's Rule 32 petition was not properly filed with the required verification, the State moves that this Court stay the time for filing its answer under Rule 32.7(a), A.R.Cr.P., until the addendum is filed.  Should Melson's counsel fail to file the addendum within twenty-one days, the State moves this Honorable Court to dismiss Melson's Rule 32 petition for failure to meet the standards as set out in Rule 32 (a), A.R.Cr.P., for properly filing a state post-conviction petition.

*Id*. at 2.  On March 15, 2002, the trial court adopted an order proposed by the State that afforded Melson 21 days to file an addendum in line with Rule 32.6(a) A.R.Cr.P., but also provided that the order was not to be "construed as granting petitioner leave to file an amended Rule 32 petition."  [V. 21, R-46, at 1].

In any event, on March 25, 2002, Melson's counsel filed a document entitled Amended Petition. [V. 21, R-48. at 1].  Attached to the petition was a notarized verification, by Melson's counsel, in which she asserted to her best knowledge, information and belief, the allegations in the petition were true.  *Id*. at 17-18.  On August 15, 2002, the State filed an Answer and Motion to Dismiss.  [V. 21, R-49].  In said Answer, the State acknowledged plaintiff's verified petition as an amended complaint, and informed the trial judge that he could "summarily dismiss" each and every one of Melson's ineffective assistance of counsel claims since he observed Melson's counsel at trial and could judge his effectiveness.  *Id*. at 12-13.  In the alternative, the State proffered answers to Melson's individual ineffectiveness

13

claims, arguing Melson's petition was due to be dismissed as to each claim either because he failed to state a claim pursuant to Rule 32.3, and 32.7(d) of the A.R.Cr.P., and/or meet specificity requirements as dictated by Rule 32.6(b) of the same rules. *Id.* at 13-43. Finally, the State asserted Melson's claim that Alabama's Capital Sentencing scheme was unconstitutional was procedurally barred. *Id.* at 44. Melson responded to the State's answer [V. 21, R-50] and on October 17, 2002, the trial court denied Melson's petition, writing,

> Melson's Amended Rule 32 petition is summarily dismissed pursuant to Rule 32.7(d) of the Alabama Rules of Criminal Procedure respectively for failing to (1) raise a material issue of fact or law, (2) state a claim, and (3) meet the specificity requirement. In addition, Melson's Amended Rule 32 petition is summarily dismissed to the extent it is based on claims that are precluded from review. Rule 32.2(a), 32.7(d), A.R.Cr.P. Furthermore, "no purpose would be served by any further proceedings." Rule 32.7(d), A.R.Cr.P.

[Vol. 21, R-51, at 1].

Respondent asserts that Melson's March 4, 2002, initial petition was not properly filed in accordance with Alabama procedural rules, and as such, "did not toll Melson's time for filing a petition for writ of habeas corpus." [Doc. #13, at 4-5 (citing *Hurley v. Moore*, 233 F.3d 1295, 1297-98 (11th Cir. 2000))]. Respondent further believes that tolling did not commence until Melson filed a properly verified petition in the Circuit Court of Etowah County on March 25, 2002, more than "a year (384 days) after his conviction became final and the one-year limitations period of § 2244(d) began to run . . . . *Id.* at 5 and [V. 21, R-48, p. 27].

14

On the other hand, Melson contends that his March 4, 2002, petition was properly filed for purposes of the tolling requirements in 28 U.S.C. §2244(d)(2), arguing that Alabama has recently ruled that

> "proper verification of a Rule 32 petition, although required by Rule 32.6(a), is not a jurisdictional prerequisite to the filing of the petition and, accordingly, . . . the lack of proper verification does not deprive the circuit court of subject matter jurisdiction of a Rule 32 petition." *Smith v. State*, 2005 WL 435138, at *13 (Ala. Crim. App. Feb. 24, 2005); *See also Edwards v. Carpenter*, 529 U.S. 446, 450 (2000)(stating that only rules that are "firmly established and regularly followed" qualify as adequate state grounds for precluding substantive review of federal claims).

[Doc. #19, at 52].

 Melson therefore argues that his Rule 32 petition was properly filed.  The court does not agree with Melson's conclusions.  The question is not whether Melson's initial failure to comply with the verification requirements of Rule 32 deprived the trial court of subject matter jurisdiction, but whether the initial application was properly filed in accordance with state procedural rules - jurisdictional or otherwise.  *Artuz v. Bennett*, 531 U.S. at 8.

Melson is correct that the *Smith* court battled with conflicting judicial interpretations as to "whether [the] lack of proper verification of a Rule 32 petition is a jurisdictional defect, necessitating dismissal of an appeal from ruling on a jurisdictionally defective petition, or whether lack of proper verification constitutes only a defect in the form of the petition that is subject to waiver."  *Smith v. State*, 2005 WL 435138, *12 (Ala.Crim.App. February 25, 2005).  While the court ultimately found that the lack of verification was not a jurisdictional defect, it was still, nonetheless, a defect as to form.  *Id.* at 12.  The court wrote,

> proper verification of a Rule 32 petition, although required by Rule 32.6(a), was not intended to be a jurisdictional prerequisite to the filing of the petition. Instead, the verification requirement is more appropriately a matter of form, the omission or inadequacy of which amounts to an irregularity that is subject to cure by a proper and timely amendment, and may be waived by the State if not properly raised. This construction, we think, is consistent with this Court's relation back doctrine - - the timely filing of a Rule 32 petition that is not in the proper form tolls the limitations period of Rule 32.2(c) so that the 'amended petition' relates back to the date of the filing of the original petition, provided the amended petition is filed within a reasonable time.

*Id.*

Melson's March 4, 2002, Rule 32 application was not properly filed, and therefore did not trigger the tolling requirements of 28 U.S.C. § 2244(d)(2). The Eleventh Circuit has expressly acknowledged the Supreme Court's decision in *Artuz* as being one that defined "properly filed" as an application

> "deliver[ed] and accept[ed] . . . in compliance with the applicable laws and rules governing filings[,]" . . . examples of these laws and rules [are] those which prescribe "the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee."

*Hurley v. Moore,* 233 F.3d 1295, 1297, fn 2 (11th Cir. 2000), *quoting Artuz v. Bennett,* 531 U.S. 4 (2000).

In order to trigger the tolling requirements of 2244(d)(2), Melson's Rule 32 petition had to be properly filed no later than March 6, 2002. Melson failed to do so. Although Alabama may allow an improperly filed form to toll Rule 32.2(c), as long as an amendment correcting same follows and relates back within a reasonable time thereafter, the Eleventh Circuit has ruled that the statutory tolling provision of § 2244(d)(2) does not allow an

16

improperly filed application to be corrected and relate back to the original filing date, thus

bringing the petitioner within the statute of limitations set out in § 2244(d)(1)(A).  *Sibley v.*

*Culliver*, 377 F.3d 1196, 1201 (11th Cir. 2004).  The court wrote,

> We note in closing that none of the documents [petitioner] attempted to file
> with the state courts after . . . - - the deadline for filing a federal habeas
> petition - - could in any way toll that deadline because, once a deadline has
> expired, there is nothing left to toll.  A state court filing after the federal
> habeas deadline does not revive it.  *See Moore v. Crosby*, 321 F.3d 1377, 1381
> (11th Cir. 2003) ("While a 'properly filed' application for post-conviction
> relief tolls the statute of limitations, it does not reset or restart the statute of
> limitations period once the limitations period has expired.  In other words, the
> tolling provision does not operate to revive the statute of the one-year
> limitations period if such period has expired.'").  Petitioner may not attempt
> to resurrect a terminated statute of limitations by subsequently filing
> documents that purport to "relate back" to previously submitted documents
> that were, in themselves, insufficient to toll the statute.  *Id.* at 1381.  ("The
> period of time in which a state prisoner does not have a 'properly filed' post-
> conviction application actually pending in state court.").  Consequently, we
> need not examine the substance of his later filings because, even if they were
> "properly filed application[s] for State post-conviction or collateral review,"
> they would not extend [the one year] deadline.

*Id.* at 1204.

Since Melson's March 4, 2002, Rule 32 application did not trigger the tolling

requirements of 28 U.S.C. § 2244(d)(2), and his March 25, 2002, amended complaint cannot

relate back to the filing date of his original application, Melson's petition for writ of habeas

corpus is untimely as per the statutory requirements of  28 U.S.C. § 2244(d)(1)(A).

However, the question does not end there since the Eleventh Circuit has traditionally found

that the statutory tolling provisions of Section 2244(d)(1)(A) are also subject to equitable

tolling.  In order to gain relief by way of equitable tolling, Melson must

17

show that there are extraordinary circumstances present in his case to warrant the application of equitable tolling. "Equitable tolling is an extraordinary remedy which is typically applied sparingly." *Steed* [*v. Head,*] 219 F.3d [1298,] 1300 [11th Cir.2000)]. It is available "when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence." *Sandvik v. United States,* 177 F.3d 1269, 1271 (11th Cir.1999).

*Lawrence v. Florida*, 2005 WL 2055875, *5, — F.3d —  (11th Cir.(Fla. 2005).

Melson argues that equitable tolling should be made available to him because his post-conviction counsel were not only negligent, but egregiously so.[4] However, it is apparent that any attorney error surrounding the verification of Melson's Rule 32 petition was nothing more than negligence, and it is well known that "attorney negligence is not a basis for equitable tolling, especially when the petitioner cannot establish his own diligence in ascertaining the federal habeas filing deadline." *Id. citing Howell*, 415 F.3d at 1250; *Helton,* 259 F.3d at 1313; *Steed*, 219 F.3d at 1300; *Sandvik,* 177 F.3d at 1270.

For the foregoing reasons, the court finds that Melson's petition for writ of habeas corpus was not filed within the one-year statute of limitations as required by 2244(d)(1)(A), nor is he entitled to equitable tolling of that statutory period.

---

[4] [Doc. #19, at 54-66]. Melson argues that he reasonably relied upon his counsel's representations that they would seek to fruition his post-conviction remedies. [Doc. #19, at 54-68]. However, the alleged egregious errors of counsel and showing of his own diligence to ascertain the federal filing deadlines began after his appeal from the denial of his Rule 32 petition as untimely. Because Melson's federal petition was already time barred due to lack of verification of the original petition on March 4, 2002, Melson's complaints about counsel, her affidavit, the affidavit of Ms. Watkins and his own actions from December 2002 and thereafter are immaterial and irrelevant to the real question - whether or not Melson's Rule 32 application was properly filed prior to March 6, 2002. *Id.* at 59. [DeFranco and Watkins' affidavits to Doc #19 ].

**B.    Whether Melson timely filed his petition pursuant to 28 U.S.C. § 2244(d)(1)(D).**

The factual predicates for Melson's newly discovered claims fall into two (2) categories.  First, Melson claims, that in the fall of 2004, he discovered new evidence of his innocence which could not have been found prior to that date.  [Doc. #9, at 11-31].  Second, Melson claims the prosecution's willful suppression of evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), prevented him from discovering certain evidence until the "fall of 2004."  [Doc. #19, at 29-38].  Therefore, when he included the newly discovered factual predicates for his claims in his federal habeas petition in the fall of 2004, by filing his federal petition on December 15, 2004, he met the statute of limitations requirement set out in 28 U.S.C. § 2244(d)(1)(D).  *Id.* at 31.  It reads,

(d)(1)  A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from . . .[5]

(D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.[6]

"To warrant application of section 2244(d)(1)(D), [Melson] must persuade this [c]ourt that he exercised due diligence in his search for the factual predicate of his claim." . . . .

---

[5]  Excluded is "the latest of-", with the court recognizing that the calculable date can be the latest of four possible scenarios set out in Sections (d)(1)(A)-(D).

[6]  To buttress his claims, Melson has moved for discovery of certain information from respondent.  [Doc. #8, as revised by Doc. #24, at 2-8].  Respondent does not specifically address this argument in his Motion to Dismiss [Doc. #13], but does object to Melson's request for discovery because "he has not produced any evidence [in his present possession] of actual innocence."  [Doc. #25, at 3].

[Normally,] [t]he inquiry is "whether a reasonable investigation . . . would have uncovered the facts the applicant alleges are 'newly discovered.'" *Bailey v. Crosby*, 2005 WL 2149285, *5, — F.Supp.2d —  (M.D. Fla. 2005) *quoting In re Boshears*, 110 F.3d 1538, 1540 (11th Cir.1997).

However, in Melson's case, the question of whether the newly discovered factual predicates proposed by him meet the due diligence criteria of 28 U.S.C. § 2244(d)(1)(D), and whether equitable tolling principles should be applied to those that do not, are ultimately immaterial because Melson failed to first present said factual predicates in state court prior to filing the present federal petition.

Although Melson contends he is entitled to proceed with his newly discovered evidence claims, the substance of which he only learned in late 2004, the record is clear that Melson never filed a successive Rule 32 petition concerning said claims in Alabama state court, when a procedure for him to do so was clearly available to him.  Rule 32.2(c) A.R.CR.P. (2004) reads, *in pare materia*:

> A successive petition on different grounds [than a previous petition] shall be denied unless . . . (2) the petitioner shows both that good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice.

Additionally, the scope of the remedies available in Alabama collateral proceedings shows that a procedure was available to Melson which would have allowed him to present

the substance of his newly discovered evidence claims.  In 2004, Rule 32.1(e)(1)-(5) of the

A.R.Cr.P. allowed a convicted prisoner appropriate relief from his conviction as follows:

(e) Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:

(1) The facts relied upon were not known by the petitioner or the petitioner's counsel at the time of trial or sentencing or in time to file a posttrial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;

(2) The facts are not merely cumulative to other facts that were known;

(3) The facts do not merely amount to impeachment evidence;

(4) If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and

(5) The facts establish that the petitioner is innocent of the crime for which the petitioner was convicted or should not have received the sentence that the petitioner received.

Further, Rule 32.2(c) of the A.R.Cr.P., afforded Melson "six months" after the newly

discovered material facts . . . . to file his petition.  Since Melson's counsel contends the

discoveries took place in fall 2004, Melson had more than an adequate chance to file a

successive Rule 32 petition challenging his conviction in state court.  Further, pursuant to 28

U.S.C. § 2254(b)(1)(A), he was required to do so before filing his federal petition.  *See also*

*Slack v. McDaniel*, 529 U.S. 473 (2000)(citing *Rose v. Lundy*, 455 U.S. 509 (1982)).

Yet, he chose to bypass the state court in December 2004, and filed the present habeas

petition.  Respondent has not argued that Melson failed to exhaust the remedies available to

him in state court.  Nevertheless, it is within this court's discretion to do so, if Melson still has any state court remedies available.  However, even if this court were to dismiss Melson's petition without prejudice, so that he could pursue a state court remedy, his Rule 32.2(b) petition is now time barred pursuant to Rule 32.2(c), and therefore unavailable.

A federal court may treat unexhausted claims as procedurally defaulted, even absent a state court determination to that effect, if it is clear from state law that any future attempts at exhaustion would be futile.  *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998).  Accordingly, Melson's newly discovered evidence claims are now procedurally defaulted.  Melson can only attain relief if he can show cause and prejudice for failing to present his newly discovered evidence claims in state court, or that a miscarriage of justice will occur if his claims are not heard.[7]

As to cause and prejudice, the only possible cause for failing to present the claims first in state court would be the ineffective assistance of habeas counsel.  Although such a claim

---

[7]  It is important to note that, in addition to using his newly discovered evidence as an actual innocence exception to his procedurally defaulted claims, Melson also asserts he is able to show his actual innocence, and thus overcome his procedural default, through two statements by his co-defendant, Cuhuatomec Peraita. [Doc. #9, at 24-27].  The statements, allegedly signed by Peraita in 2001 and 2002, have been recreated in the body of Melson's petition.  In the statements, C. Peraita purportedly wrote that Melson was not with him at Popeye's on the night of the murders, that police frightened him into saying Melson was with him, and that he did not testify during Melson's trial because the district attorney wanted him to lie.  *Id.*  The original statements have not been offered as Exhibits, nor has C. Peraita signed an affidavit under oath or penalty of perjury.

Said statements cannot be reasonably regarded as newly discovered since they have been in existence since 2001 and 2002.  Plaintiff never attempted to present this claim in state court at any time.  Thus, like plaintiff's newly discovered evidence claims, C. Peraita's statements are untimely and procedurally defaulted.

22

is arguably procedurally defaulted in and of itself, it is, in any event, without merit, because plaintiff has no constitutional right to effective habeas counsel.  Thus, any independent failures of habeas counsel cannot serve as cause to excuse the default of Melson's newly discovered evidence claims. As aptly stated by the Supreme Court

> A procedurally defaulted ineffective-assistance claim can serve as cause to excuse the procedural default of another habeas claim only if the habeas petitioner can satisfy the "cause and prejudice" standard with respect to the ineffective-assistance claim itself.  The procedural default doctrine and its attendant "cause and prejudice" standard are grounded in comity and federalism concerns, *Coleman v. Thompson*, 501 U.S. 722, 730, 111 S. Ct. 2546, 115 L. Ed.2d 640, and apply whether the default occurred at trial, on appeal, or on state collateral attack, *Murray v. Carrier*, 477 U.S. 478, 490-492, 106 S. Ct. 2639, 91 L. Ed.2d 397.  Thus, a prisoner must demonstrate cause for his state-court default of any federal claim, and prejudice therefrom, before the federal habeas court will consider that claim's merits.  501 U.S. at 750, 111 S.Ct. 2546. Counsel's ineffectiveness in failing properly to preserve a claim for state-court review will suffice as cause, but only if that ineffectiveness itself constitutes an independent constitutional claim.  *Carrier, supra*, at 488-499, 106 S.Ct. 2639.

*Edwards v. Carpenter*, 529 U.S. 446, 447 (2000).

Further,

While constitutionally ineffective assistance of counsel has been considered cause to excuse a procedural default that occurs at a stage in the proceedings in which the defendant enjoys a Sixth Amendment right to the effective assistance of counsel, there is no constitutional right to an attorney in state post-conviction proceedings.  *See Coleman v. Thompson*, 501 U.S. at 752. "Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Id.*  Therefore, any ineffectiveness of present habeas counsel for failing to file a petition first in state court could not be considered cause for the purposes of excusing the procedural default that occurred in this case at the state collateral post-conviction level. *Id.; In re Magwood*, 113 F.3d 1544, 1551 (11th Cir.1997); *Johnson v. Singletary,* 938 F.2d 1166, 1174-75 (11th Cir.1991).  With AEDPA, Congress codified this

23

rule by enacting § 2254(i), which provides that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."

*Henderson v. Campbell,* 353 F.3d 880, 892 (11th Cir. 2003).

For the foregoing reasons, Melson has failed to show the cause and prejudice necessary to overcome the procedural default of his newly discovered evidence claims.[8] Unless Melson can show there is, "a sufficient probability that . . . failure to review his federal claim will result in a fundamental miscarriage of justice[,]" he cannot overcome his procedurally defaulted claims. *Edwards v. Carpenter*, 529 U.S. 446 at 451. Stated differently, this exception allows a federal habeas court to consider a procedurally defaulted claim in the absence of the usual cause and prejudice standard if a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent . . ." *Schlup v. Delo*, 513 U.S. 298, 323-27, n. 44 (1995) quoting *Sawyer v. Whitley*, 505 U.S. 333, 335 (1992). *See also, Murray v. Carrier*, 477 U.S. 478, 496 (1986)  (other citations omitted)).

Following the lead of the *Schlup* Court, the Eleventh Circuit examined the preliminary showing required for the actual innocence exception to be considered by the court, writing,

> As we held in *Wyzykowski v. Dep't of Corr.,* 226 F.3d 1213, 1218 (11th Cir.2000), "[T]he factual issue of whether the petitioner can make a showing of actual innocence should be first addressed, before addressing the constitutional issue of whether the Suspension Clause requires such an exception for actual innocence."  Following *Wyzykowski*, we decline to reach

---

[8]  This reasoning applied to the statements of C. Peraita as well.

24

the merits of this issue because, even assuming that § 2244's limitations period could not be constitutionally applied to a prisoner who made a sufficient showing of actual innocence, Sibley failed to do so.

> [A] person sentenced to death might be able to show "actual innocence . . . ." [by] attempt[ing] to prove his innocence of the underlying capital offense itself. In *Schlup v. Delo*, 513 U.S. 298, 317, 115 S.Ct. 851, 862, 130 L.Ed.2d 808 (1995), the Supreme Court held that a prisoner attempting to make such a showing must raise "new facts" that cast "sufficient doubt upon [his] guilt to undermine confidence in the result of a trial without the assurance that the trial was untainted by constitutional error." In practical terms, this means that the petitioner must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" . . . *Id.* at 327, 115 S.Ct. at 867 (*quoting Murray v. Carrier*, 477 U.S. at 496, 106 S.Ct. at 2649). (Footnotes omitted).

*Sibley v. Culliver*, 377 F.3d at 1205-06.

Having carefully examined the standard to be applied to actual innocence claims such as Melson's, the court now reviews Melson's contention that he is actually innocent of capital murder, and therefore should be allowed to proceed with his procedurally defaulted claims. The historical presence of each witness in Melson's case, as well as the substance of the newly discovered evidence purportedly contained in their affidavits, shall be examined. Thereafter, Melson's contention that his actual innocence is established by the 2001 and 2002 statements of C. Peraita will be examined.

During the examination, the court will assume the affidavits of the witnesses are true. If the substance of the information reviewed could not possibly meet the *Schlup* standard, then further proceedings concerning the information are unnecessary. In other words, if the newly discovered evidence does not cast sufficient doubt upon Melson's guilt to undermine

confidence in the verdict in the sense that a reasonable juror would probably have convicted Melson of the crime even if the evidence had been presented at trial, then Melson has not established sufficient actual innocence to overcome his procedurally defaulted claims.  If so, the court will then address the particular *Brady* claim at issue.[9]

### 1. Bryant Archer

Melson presents statements of Bryant Archer, the sole surviving witness, through the declaration of Sara Romano, a private investigator who interviewed Mr. Archer on January 6, 2005. [Doc. #19, Romano affidavit].  Prior to revealing the content of the evidence purportedly discussed by Archer during the interview with and as recorded by Ms. Romano, it is duly noted that Ms. Romano admits that Mr. Archer refused to speak with her after reading her version of his statements in the amended complaint, and informed Ms. Romano that she had "twisted" his words.  *Id.* at 1-2.  No affidavit or declaration from Mr. Archer has been offered by Melson or respondent.

Melson contends that Archer's January 6, 2005, statements are offered in support of his *Brady* and actual innocence claims.  [Doc. #9, at 37, ¶¶ 73, and 11-31, ¶¶ 33-64].  First,

---

[9] Melson also presents the affidavit of Robert Morgan, a juror at Melson's trial, who attests that if he had been privy at trial to the newly discovered evidence now presented by Melson, he would not have found Melson guilty of the crimes.  [Doc. #19, Morgan affidavit].  However, said affidavit shall not be considered pursuant to Rule 606(b) of the FED.R.CIV.P.  Rule 606 pertains to the competency of a juror to testify as a witness, and subsection (b) of that rule specifically pertains to that competence when there is an inquiry into the validity of a verdict or indictment.  Pursuant to Rule 606(b), Mr. Morgan is legally incompetent to testify about the matters in his affidavit, and as such, said affidavit shall not be considered.  *See also Williams v. Collins*, 16 F.3d 626 (5th Cir. 1994).

Melson asserts that Archer did not truthfully testify at trial, and "the prosecution never informed trial counsel that Mr. Archer, the surviving victim, "had described his [black] assailant as having 'bushy hair'" and being inches taller than Mr. Peraita or that he pinpointed the assailants' entry into the restaurant at 11:30 p.m." *Id*. at 37, and 13-14. Melson also claims that, at trial, Archer failed to reveal he had a pre-existing hearing impairment, and that Archer now remembers that while he was in the freezer, he saw a black male open the door with his right hand and shoot with the left hand[10], whereupon Archer tried to reach up to find something with which to hit the shooter. *Id*. at 12, ¶¶ 35. Additionally, unlike his trial testimony wherein Archer stated he lost consciousness after being shot 5 times, awoke, and crawled over his dead co-workers to get to a telephone, Archer now purportedly says that he watched the robbers walk out of the store, did not lose consciousness, and walked to the telephone to call the police, although in his memory everything was dreamlike. *Id*. at 12-13. Finally, Archer purportedly informed Ms. Romano that he had been questioned and shown photo line-ups by police numerous times at the hospital and thereafter, but was never able to identify the black male who shot him.

## Analysis

Archer allegedly informed Romano that the photo line-up containing Melson's picture showed Melson in cornrows, and that the shooter had a one-inch messy afro.[11]   Assuming

_____

[10]  At point which Melson places a footnote, asserting he "is right-handed." *Id*. at fn 2.

[11]  [Doc. #19, Romano affidavit, at 4].  Melson also introduces the affidavit of Melissa Patterson, who attests that Melson's hair was cut very short - close to the skull - when she saw

this allegation is true, there is no reasonable probability that a juror may have seriously questioned whether Melson was indeed the shooter.

However, even if this evidence of actual innocence is sufficient to overcome the procedural default of Melson's *Brady v. Maryland*, 373 U.S. 83 (1963) claim pertaining to the same subject, a careful review of the situation shows there was no *Brady* violation.  In *Banks v. Dretke*, 540 U.S. 668, 670-72 (2004), the United States Supreme Court explained the three essential elements of a *Brady* claim.

> A *Brady* prosecutorial misconduct claim has three essential elements. *Strickler v. Greene*, 527 U.S. 263, 281-282, 119 S.Ct. 1936, 144 L.Ed.2d 286. . . . [T]he evidence at issue [must] be favorable to the accused as exculpatory or impeaching . . . . the State suppressed the evidence at issue[,] [and the] suppressed evidence is "material" for *Brady* purposes.  *Ibid.*

*Banks v. Dretke*, 540 U.S. at 671.

As per Melson's trial counsel, on January 24, 1996, he received a copy of the photo line up shown to Bryant Archer, as well as a photograph taken of Melson at the police department on April 16, 1994.  [Doc. #19, Hart affidavit, at 4].  There is no mention by trial counsel of the state of Melson's hair in any of these pictures.  Nor does Melson attempt, at this juncture, although same should be relatively easy in light of the foregoing discovery admittedly given to him, to shed light on the state of his hair on April 15 and 16, 1994.

Defense counsel Hart also attests that on February 29, 1996, he met with the D.A. to review the State's evidence, and viewed "a photo line-up of black males shown to Bryant

---

Melson on the night of the murders.  *Id.* at Patterson affidavit, p. 2.

Archer," "an unsigned note made at 2:00 p.m. on April 17, 1994 regarding Bryant Archer's statement that the black male had a blue bandana just over his face, and a hat turned backward[, as well as a statement] regarding the photo line-up of black males shown to Mr. Archer." *Id.* at 4-5.  Hart does not reveal the substance of Archer's statement regarding the line-up. *Id.* at 5.

Thus, even if it is assumed that Archer's statement concerning the messy afro was suppressed by the prosecution, Melson has still failed to show that "'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Banks v. Dretke*, 540 U.S. at 672, *quoting Kyles* [*v. Whitley*], 514 U.S., [419], 435 [(1995)].

There is no reasonable probability that Melson would have been found innocent if Archer had identified the black assailant as being inches taller than C. Peraita at the trial [Doc. #19, Romano affidavit, at 4], and therefore Melson has failed to show sufficient proof of his actual innocence to overcome his procedural default.  Moreover, it was well known at the time of trial that the black suspect was taller than C. Peraita.  On May 16, 1994, Officers Wright and Ragan told Melson's counsel that Melson was "taller than both of the people who committed the robbery-murders at Popeye's." [ Doc. #19, Hart affidavit, at 2].  Since Archer was the only individual to survive the shooting, counsel certainly was aware that Archer believed the co-defendant to be taller than Peraita and Melson, and could have

easily cross-examined Archer on the subject.      These are simply not new facts because they were known to Melson at the time of trial.

Assuming Bryant Archer informed Ms. Romano that the assailants entered the back door at 11:30 p.m. on April 15, 1994, and had previously informed law enforcement officials of same, there is no reasonable probability that a juror may have seriously questioned whether Melson was innocent of the crime with which he is charged.[12]   The court finds Archer's hearing deficits, the position of his body in the freezer, and whether the shooter was right or left handed to be of no significance whatsoever.

Further, the 11:30 p.m. time-line, which Melson attempts to enhance by asserting that Archer may not have lost consciousness before he called the police, is offered to skew the time period in which the murders occurred.  If the 11:30 time-line is to be believed, and Archer did not lose consciousness, then the 12:26 a.m. police dispatch makes Archer's version of events seem incongruous.  However, it is not so incompatible, when compared to Archer's injuries, and testimony at trial, and other discrepancies presented by Melson, that there is a reasonable probability that a juror may have seriously questioned whether Melson was indeed guilty.

Finally, even though Melson now presents testimony of a witness who asserts that she saw Melson between 11:00-11:30 p.m. on the night of the murders, said testimony, when

_____

[12]  At trial, Archer testified Popeye's closed at 11:00 p.m., that the front desk cashier left at 11:15 p.m., and that the employees went about their nightly duties such as cleaning before leaving the store. He stated that emptying the garbage was one of the last duties, but never identified an exact time when the employees opened the back door for the purpose of accomplishing same.

viewed in the context of an 11:30 p.m. robbery time, still does not provide an alibi for Melson.  Three (3) other witnesses attest that Melson was either with them or heard his voice before Julio (Melson's half-brother, boyfriend to one of the witnesses, and the "true" murderer) arrived at the apartment, either carrying or wearing bloody clothes.  None of these witnesses knew the exact time Julio arrived at the apartment.  Thus, even if the three (3) witnesses' statements are believed, the significance of their testimony lies not in the 11:30 p.m. time-line proposed by Melson, but whether Melson had been present with them for a significant period of time on the evening of the crime.  Again, there is no reasonable probability that a juror may have seriously questioned whether Melson was indeed guilty based on the statements made by Bryant Archer.

### 2. Melissa Patterson

Next, Melson claims that witness Melissa Patterson has recanted her trial testimony and, that the State "failed to disclose . . . . that [Ms. Patterson told Detective Ragan] she saw Mr. Melson at Frankie's around the time of the murders."  [Doc. #9, at 37].  In support of this contention, Melson presents an affidavit from Ms. Patterson, in which she declares that she saw Melson outside Frankie's between 11:00 p.m. and 11:30 p.m. and that she had talked to him for about 5 minutes.  [Patterson affidavit, Doc #19, at 2].  She then went inside Frankie's and met up a friend, and the two stayed at Frankie's until about 3:00 to 4:00 a.m. the next morning.  *Id*.  Patterson "did not see or speak to Robert again that night or early morning after [she] saw him the first time."  *Id.*  Patterson also attests that on that evening, Melson's

"hair was cut very short, almost to the skin. . . . [and] he was not wearing a scarf or bandana on his head." *Id.*

Patterson admits that Melson sent her letters from the County Jail after his arrest. However, unlike her testimony at trial, she stated she brought the letters to the District Attorney after receiving a subpoena. *Id.* Patterson concedes she was told by the D.A. that she had to go to court and testify, but that she was not threatened by anyone. She states that when she was first questioned by Detective Ragan about the letters, she told him that she had seen Melson between 11:00 and 11:30 p.m. on April 15, 1994. *Id.* at 3. Patterson also declares she does not remember being asked if she had seen Melson on the night of the crime and that she was nervous and crying on the witness stand. *Id.*

Even assuming Patterson's statement is true, she cannot pinpoint the exact time she saw Melson at Frankie's on the night of the murders. Melson asserts that this information, when combined with defense witness Tyrone Porter's trial testimony that he saw Melson on Harlem Avenue between 11:30-12:00 p.m. (although he never wore a watch), shows that Melson could not have been at Popeye's during the crime. While this conclusion is certainly true as to witness Tyrone Porter's statement, the same conclusion cannot be derived from Ms. Patterson's statement. Again, there is no reasonable probability that a juror may have seriously questioned Melson's guilt based upon Patterson's statement. Therefore, Melson has failed to establish that a miscarriage of justice would occur if the procedurally defaulted claims pertaining to Patterson are not reviewed.

### 3.  __Laura Laverty and Edmundo Peraita - (co-defendant's brother)__

Next, Melson contends that the "prosecutor did not disclose to defense counsel that the prosecutor had threatened Laura Laverty into testifying."  [Doc. #9, at 37].  Elsewhere in his amended petition, Melson contends that the prosecutor threatened "to remove [Laverty's] children from her custody unless she assisted the prosecution in obtaining a conviction against Mr. Melson."  *Id.* at 15.  Ms. Laverty did not file an affidavit saying such a threat took place, and Melson's other witness, Edmundo Peraita, only asserts that Laverty told him she was threatened and scared into telling the police about how he had disposed of the gun in the river.  [Doc. #19, Peraita affidavit, at 2].  Peraita "recalls getting a note to that effect" but "does not remember the circumstances under which she was threatened."  *Id.*

Melson also accuses the prosecution of failing "to disclose statements obtained from Edmundo Peraita relative to his disposal of the murder weapon."  [Doc. #9, at 38].  Despite the open file policy, Melson contends his trial counsel did not learn of the circumstances surrounding the recovery of the murder weapon until a pre-trial hearing on April 1, 1996, approximately two weeks before trial.  [Doc. #19, at 6, *citin*g R. 144].  At that time, the D.A. made assurances that there were no written statements made by Edmundo Peraita.  Peraita attests that after the police found the gun, he "signed something, but [doesn't] recall what it was.  [Doc. #19, Peraita affidavit, at 3].

Melson has no witness or basis upon which to support his belief that Laura Laverty was threatened with the loss of  her children if she failed to cooperate with law enforcement.

Moreover, Edmundo Peraita can't remember if he signed a written statement or not.  Even if he did sign a statement concerning the location of the weapon, Melson has not provided any factual basis to show that information contained in the statement was of any import other than what was already known by Melson and his counsel at trial, and this information certainly does not go to whether Melson did or did not commit the crime.  Therefore, Melson has failed to establish that a miscarriage of justice would occur if the procedurally defaulted claims pertaining to Laura Laverty and E. Peraita are not reviewed.

Even if Melson could satisfy the miscarriage of justice exception (which he most certainly has not) to his procedural default, he  has also failed to show that the prosecution withheld evidence given by Laverty or Edmundo Peraita, exculpatory or impeaching, which would have favored him as to the issue of his guilt.  Thus, Melson has failed to establish a valid *Brady* claim because his newly discovered evidence does not cast sufficient doubt upon his guilt to undermine confidence in the verdict.

### 4.  <u>Declarations of Joyce Watson, Vanessa Watson and LaShunda Davis</u>

Three of the witnesses allegedly providing newly discovered evidence are sisters named Joyce Watson, Vanessa Watson, and LaShunda Davis. [See respective witness affidavits, each attested to in April 2005, at Doc. #19].  At the time of the crime, Joyce Watson was the girlfriend of Julio St. George, Melson's half brother, and now the alleged perpetrator of the crimes.

34

The facts in the affidavits of the three (3) sisters are not new.  Melson offers no reason why he could not have obtained the statements of these witnesses, particularly when it is obvious from the record that he knew at the time of his trial that he had been in the presence of these witnesses who now seek to support Melson's alibi defense, and in light of Melson's active search for alibi witnesses before the trial of his case.  Thus, Melson has failed to satisfy the "new facts" element of his actual innocence *Schlup* argument, and therefore, has provided no excuse for his procedural default.

### 5. **Cuhuatemoc Peraita**

Finally, the court turns its attention to the statements of Cuhuatemoc Peraita.  First, Melson has known of these purported statements since 2001 and 2002, but has never presented them until now.  Further, the recantations made by C. Peraita are not sworn to under oath or penalty of perjury.  *Sibley v. Culliver*, 377 F.3d 1196, 1206-07 (11th Cir. 2004).  Finally, Melson does not even include the statements as exhibits in support of his claims.  Instead, Peraita's statements have been typed in the body of the amended petition.  Melson has failed to satisfy the "new facts" element of his actual innocence *Schlup* argument, and failed to establish that a miscarriage of justice would occur if this procedurally defaulted claim were considered.

35

## <u>CONCLUSION</u>

For the foregoing reasons, the petition for writ of habeas corpus filed by Robert Melson is due to be DISMISSED, and his requests for discovery, to compel discovery, and evidentiary hearing are DENIED. [Doc. #8, #9, #24, and #26].

DONE on this 28th day of September, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge